**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| AEROFIL TECHNOLOGY, INC. and | ) | |
| AMERICAN INTERNATIONAL | ) | |
| SPECIALTY LINES INSURANCE | ) | |
| COMPANY, | ) | No. 4:15-cv-01589 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| LIBERTY SURPLUS INSURANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | | |

<u>**COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES**</u>

COMES NOW Plaintiffs Aerofil Technology, Inc. ("Aerofil") and American International Specialty Lines Insurance Company ("AISLIC") (collectively "Plaintiffs"), by and through their counsel Blitz, Bardgett & Deutsch, LC and Hinkhouse Williams Walsh LLP, and for their Complaint for Declaratory Judgment and Damages against Defendant Liberty Surplus Insurance Corporation ("Liberty"), state as follows:

<u>**INTRODUCTION**</u>

1.     This Complaint for Declaratory Judgment and Damages arises out of underlying claims and injuries caused by the harmful exposure to a spray-on grout sealer referred to as Stand 'n Seal Spray-on Grout Sealer, which led to hundreds of products liability lawsuits being filed in jurisdictions throughout the country against the product packager, Aerofil Technology, Inc. ("Aerofil"), the product distributor, Roanoke Companies Group, Inc. ("Roanoke"), and others.

2.     Many of the products liability lawsuits were consolidated into Multidistrict Litigation ("MDL") proceedings captioned *In Re: Stand 'N Seal Products Liability Litigation*, No. 1804 before the U.S. District Court for the Northern District of Georgia (collectively, "SNS

Litigation").

3.    In addition to incurring tens of millions of dollars in defense costs, more than $16.5 million was paid by Aerofil and Roanoke to resolve the SNS Litigation.

4.    Following the conclusion of the SNS Litigation, Roanoke and Aerofil arbitrated cross-claims for contribution and indemnity seeking a determination and reallocation of settlement payments and defense expenses they each expended for the SNS Litigation.

5.    On April 21, 2015, the Arbitrator issued a "Final Arbitration Award," which ordered Aerofil to pay Roanoke a total of $29,781,030 (plus interest) as follows:  (1)  $7,343,751 in indemnification to Roanoke for its settlement payments in the SNS Litigation, plus 6.25% interest per annum from August 5, 2014 until paid; (2) $20,708,811 for Roanoke's attorneys' fees and expenses incurred in the SNS Litigation, plus 6.25% interest from the date of the Award until paid; and (3) $1,728,468 for Roanoke's attorneys' fees, expenses, and costs related to the arbitration, plus 6.25% interest from the date of the Award until paid.

6.    A settlement in principal was reached between Aerofil and Roanoke in August 2015 to resolve the $30 million Arbitration Award.

7.    Plaintiff AISLIC issued a Commercial Excess Liability Policy to Aerofil for the annual period incepting on August 8, 2005, which sat excess of a primary policy issued by another insurer, Illinois Union, during the same policy period.

8.    Defendant Liberty issued two primary insurance policies to Aerofil for the annual periods incepting on August 8, 2006 and August 8, 2007, which each provided coverage for the SNS Litigation and the Arbitration proceedings.

9.    Liberty's duty to defend under its primary policies was triggered by any claims and/or lawsuits that were asserted against Aerofil during its policy periods.

10.     In addition to its defense obligation, Liberty had a duty to indemnify and settle claims on behalf of Aerofil under its primary policies for claims and/or lawsuits related to the SNS Litigation and the Arbitration.

11.     Throughout the course of the underlying SNS Litigation, numerous lawsuits were filed against Aerofil during Liberty's policy periods, which triggered Liberty's duty to defend.

12.     Despite having notice of the SNS Litigation and the subsequent Arbitration proceedings, Liberty failed and/or refused to either defend or indemnify Aerofil for any of the claims or lawsuits.

13.     Instead, Liberty sat idly on the sidelines as Illinois Union, one of Aerofil's other primary insurers, defended and settled claims on behalf of Aerofil until it exhausted its primary limits in or about April 2009 through the settlement and payment of claims in the SNS Litigation.

14.     Following the exhaustion of the Illinois Union primary policy, Liberty continued to ignore its defense and indemnity obligations to Aerofil and remained on the sidelines.

15.     As a result of Liberty's breach of its duty to defend and indemnify Aerofil, AISLIC, the excess insurer, had to step in and take over defending and settling claims on behalf of Aerofil for which Liberty had the responsibility under its policies.

16.     AISLIC ultimately expended more than $22 million to defend and settle claims in the SNS Litigation and the Arbitration proceedings on behalf of Aerofil.

17.     Despite knowing there was insufficient insurance proceeds available to Aerofil and substantial exposure for the $30 million Arbitration Award, Liberty continued to sit on the sidelines and ignore its defense and indemnity obligation to Aerofil.

18.     Faced with the possibility of bankruptcy and insufficient insurance proceeds,

Aerofil contributed millions of its own funds, which were obtained primarily through extensive financing and extending its lines of credit, in order to settle the Arbitration Award.

19.     Accordingly, and as described in further detail below, this lawsuit for Declaratory Judgment and Damages seeks a judicial determination of Liberty's obligations under primary policies of insurance it issued to Aerofil, as well as damages and other relief from Liberty for losses paid by Aerofil and AISLIC arising from Liberty's failure or refusal to provide a defense and indemnity to Aerofil for the SNS Litigation and the Arbitration proceedings.

## JURISDICTION AND VENUE

20.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 2201 and 1332.  The matter involves a controversy between citizens of different states and exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims asserted herein, as well as the delivery and negotiation of the relevant insurance policies at issue, occurred in this district.  AISLIC and Aerofil are also entitled to declaratory relief under the Declaratory Judgment Act, pursuant to 28 U.S.C. §§ 2201 and 2202, because an actual controversy exists between the parties as to their respective rights, duties, and obligations under certain liability insurance policies issued to Aerofil by Liberty.

## PARTIES

22.     Plaintiff Aerofil is a privately held company organized and existing under the laws of the State of Missouri, with its principal place of business in Sullivan, Missouri.

23.     Plaintiff AISLIC is an insurance company organized and existing under the laws of the State of Illinois, with its principal place of business in New York, New York.

24.     Defendant Liberty is an insurance company organized and existing under the laws of the State of New Hampshire, with its principal place of business in Boston, Massachusetts.

## FACTS

### The SNS Product Failure and Recall

25.     Roanoke is a distributor that had a relationship and agreement to sell and distribute products through Home Depot stores across the country.

26.     In or about July 2003, Roanoke entered into an agreement with SLR, Inc. ("SLR") to manufacture and package a concentrated premix formula for a "spray-on" grout sealer sold under the trade name "Stand 'n Seal 'Spray-On' Grout Sealer" ("SNS").

27.     Pursuant to the agreement between SLR and Roanoke, SLR agreed to manufacture SNS and exclusively sell that product to Roanoke for distribution to various retail outlets, which primarily consisted of Home Depot stores across the country.

28.     In order to package and label the SNS product, SLR and Roanoke needed a company that was able to aerosolize the SNS premix and also package the final product into cans bearing Home Depot's label.

29.     Aerofil, a company that specializes in aerosolizing and packaging various products, agreed to add a propellant to the SNS premix, package the product in aerosol cans, and then label the final product for distribution by Roanoke to the Home Depot retail outlets.

30.     In April 2005, SLR changed the formula of the grout sealer to include the fluoropolymer Flexipel in the SNS premix formula it provided to Aerofil.

31.     Three shipments of the SNS product were produced and shipped between April 12, 2005 and July 3, 2005 containing the new Flexipel chemical.

32.     In or around June 2005, consumer complaints began to surface involving alleged

respiratory injuries caused by the use of the SNS product.

33.     The alleged respiratory and other injuries were eventually determined to be the result of exposure to the Flexipel chemical and, on August 31, 2005, the Consumer Product Safety Commission announced a recall of the SNS product.

### The Underlying SNS Litigation

34.     By early 2006, the first lawsuits regarding the SNS product were filed in various jurisdictions across the country.

35.     By late 2007, more than 200 lawsuits were filed against Home Depot, Roanoke, SLR, Aerofil, and others relating to the SNS product, most of which were consolidated by the Judicial Panel on Multidistrict Litigation ("MDL") into *In Re: Stand 'N Seal Products Liability Litigation*, No. 1804, in the Northern District of Georgia.

36.     The underlying lawsuits generally set forth claims under various theories of liability, including negligence, gross negligence, strict products liability, breach of warranty, violations of consumer products safety acts, *res ipsa loquitor*, and failure to warn.   Two wrongful-death lawsuits were also filed arising out of the use of the SNS product.

37.     The underlying lawsuits were settled over the course of several years and by early 2012, the last of the SNS Litigation was resolved.

38.     Collectively, Aerofil, Roanoke, and their insurers (not including Liberty) paid more than $16.5 million in settlement payments to the underlying plaintiffs, which is in addition to more than $40 million that Aerofil and Roanoke ultimately expended defending the various lawsuits.

39.     Of this amount, Plaintiff AISLIC, which provided excess coverage to Aerofil, paid more than $14 million in defense and settlement payments on behalf of Aerofil related to

the SNS Litigation.

40.     Defendant Liberty, which provided primary coverage to Aerofil, neither provided a defense nor paid any settlements on behalf of Aerofil relating to any claims or lawsuits arising out of the SNS Litigation.

### *The Arbitration Proceedings*

41.     During the course of the SNS Litigation, Roanoke, Home Depot, and Aerofil entered into a "Common Interest Agreement" ("CIA"), which operated primarily as a joint-defense agreement so that these defendant parties could better facilitate and coordinate a common defense strategy in the SNS Litigation.

42.     The CIA also provided that: (1) the defendant parties would agree to reserve rights against each other to later assert cross-claims for contribution and/or indemnity following the conclusion of the SNS Litigation; and (2) those cross-claims would be resolved under the rules of the American Arbitration Association ("AAA") and decided by a single arbitrator.

43.     On April 20, 2012, Roanoke, on its behalf and as the assignee of Home Depot's rights, filed an arbitration demand against Aerofil seeking more than $30 million in contribution and indemnity from Aerofil for defense expenses and settlement payments that Roanoke and its insurers made arising from the SNS Litigation (the "Arbitration proceedings").

44.     Following extensive discovery and briefing, an arbitration hearing was held in San Francisco, California from October 28, 2013 to November 11, 2013 before retired U.S. District Court Judge Vaughn Walker.

45.     On August 5, 2014, Judge Walker issued an "Interim Award" finding that Roanoke paid a disproportionate share of the liability for the SNS Litigation, as follows:   (1) Aerofil was 100% liable for the April 2005 and May 2005 batches of SNS, which accounted for

approximately 296,931 units produced; (2) Aerofil and Roanoke were equally liable for the July 2005 batch, which accounted for approximately 50,112 units produced; and (3) Aerofil had 92.8% of the legal responsibility for any injuries and losses relating to the unknown batches.

46.     The "Interim Award" held that Aerofil was liable to Roanoke for $7,668,450, plus fees and costs to be later determined.

47.     On April 21, 2015, after additional briefing regarding the availability of indemnity for defense expenses, Judge Walker issued a "Final Arbitration Award," which ordered Aerofil to pay Roanoke a total of $29,781,030 (plus interest) as follows:  (1)  $7,343,751 in indemnification to Roanoke for its settlements in the SNS Litigation, plus 6.25% interest per annum from August 5, 2014 until paid; (2)   $20,708,811 for attorneys' fees and expenses incurred by Roanoke in the SNS Litigation, plus 6.25% interest from the date of the Award until paid; and (3)   $1,728,468 for attorneys' fees, expenses, and costs related to the Arbitration proceedings, plus 6.25% interest from the date of the Award until paid.

48.     On May 5, 2015, Roanoke filed a Petition to Confirm the Arbitration Award in the California Superior Court.

49.     On July 20, 2015, Aerofil filed an opposition to Roanoke's Petition to Confirm the Arbitration Award, as well as a Motion to Vacate the Award, primarily on basis that Judge Walker's Final Arbitration Award exceeded the scope of his authority under the CIA to award defense costs and expenses.

50.     On behalf of Aerofil, AISLIC funded all of the defense expenses and costs related to the Arbitration, including those fees and costs related to the subsequent court filings to vacate the award.

51.     In August 2015, prior to a determination on the Motion to Vacate, Aerofil and

Roanoke reached an agreement in principal to settle the $30 million Arbitration Award, which consisted of an additional payment by AISLIC of its policy proceeds and a contribution of several millions from Aerofil.

52.     Once again, Defendant Liberty neither participated nor contributed to the defense expenses or settlement related to the Arbitration proceedings.

### The AISLIC Excess Policy

53.     AISLIC issued claims-made Commercial Excess Liability Policy No. 7411021 to Aerofil for the period effective from August 8, 2005 to August 8, 2006 ("AISLIC Excess Policy"), which was directly excess to primary coverage issued by another insurance carrier, Illinois Union, effective for the same period.

54.     The AISLIC Excess Policy contained limits of liability of $10 million each occurrence and in the aggregate subject to a self-insured retention of $2 million each occurrence and $3 million general aggregate and products-completed operations aggregate.  A true and correct copy of the AISLIC Excess Policy is attached hereto as **Exhibit A**, the terms of which are incorporated herein by reference.

55.     The AISLIC Excess Policy specifically provides that AISLIC will have no duty to defend Aerofil until "the Self Insured Retention and any applicable Other Insurance to which the policy applies have been exhausted by payment of Loss."  (**Ex. A** at AEROFIL_000007).

56.     The term "Other Insurance" is defined in the AISLIC Policy, in relevant part, as "a policy of insurance providing coverage for damages covered in whole or in part by this policy….."  (**Ex. A** at AEROFIL_000022).

57.     The AISLIC Policy further provides AISLIC with subrogation rights for payments made on Aerofil's behalf that should have been borne by another party:

**N.      Transfer of Right of Recovery**

If any **Insured** has rights to recover all or part of any payment we have made under this policy, those rights are transferred to [AISLIC].  The Insured must do nothing after **Loss** to impair these rights and must help us enforce them.

(**Ex. A** at AEROFIL_000018).

### *The Liberty Primary Policies*

58.      Liberty issued claims-made primary Commercial General Liability Policy No. EGL-BO-184172-016 to Aerofil for the policy period effective from August 8, 2006 to August 8, 2007, with limits of $2 million each occurrence and $3 million general aggregate and products-completed operations aggregate, subject to a $25,000 self-insured retention for each occurrence ("2006 Liberty Policy").  A true and correct copy of the 2006 Liberty Policy is attached hereto as **Exhibit B**, the terms of which are incorporated herein by reference.

59.      The 2006 Liberty policy was renewed for the policy period effective from August 8, 2007 to August 8, 2008 ("2007 Liberty Policy") (collectively, the "Liberty Primary Policies"). Upon information and belief, the 2007 Liberty Policy contains identical, or substantially identical, terms, conditions and provisions as the 2006 Liberty Policy.

60.      The Liberty Primary Policies provided general liability and products liability insurance coverage to Aerofil for its operations anywhere in the United States.  (*See* **Ex. B**).

61.      The Liberty Primary Policies contain an Insuring Agreement, which includes an express duty to defend Aerofil for any "suit" seeking damages, as follows:

**SECTION I – COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property

> damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

(*See* **Ex. B** at AEROFIL_000092).

62.     According to the terms of the Liberty Primary Policies, Liberty's duty to defend is triggered when a claim for damages because of "bodily injury" is first made against Aerofil during the policy period of the relevant Liberty Policy.  (*See* **Ex. B** at AEROFIL_000092-AEROFIL_000093).

63.     The Liberty Primary Policies also provide that a claim is "deemed" to have been first made when "notice of such claim is received and recorded by any insured or by us, whichever comes first…"  (*See* **Ex. B** at AEROFIL_000093).

### *Liberty's Refusal to Defend or Indemnify Aerofil for the SNS Litigation and the Arbitration*

64.     Of the more than 200 lawsuits that were filed against Aerofil in the SNS Litigation, dozens of claims and lawsuits were first reported to or filed against Aerofil during the relevant policy periods of the Liberty Primary Policies.

65.     At various times, beginning in late 2006 and continuing throughout 2007 and 2008, as claims and lawsuits were still being asserted and filed against Aerofil on a consistent basis, those new claims were being reported and tendered to Liberty and its coverage counsel through Aerofil's third party claims administrator, Corporate Claims Management, Inc. ("CCMI").

66.     At various times during the ongoing SNS Litigation, Liberty also requested and received detailed information and reports from Aerofil and CCMI about pending claims and the

status of the SNS Litigation, and also requested and received loss run information regarding payments and settlements funded by Aerofil's other insurers, including AISLIC.

67.     Liberty was therefore keenly aware of the nature and complexity of the SNS Litigation involving Aerofil, the significant exposure Aerofil faced, and the extensive defense and settlement payments made by Aerofil's other insurers, including AISLIC.

68.     Liberty was also keenly aware of the specific claims that were asserted against Aerofil during Liberty's policy periods, the status of those claims, as well as the status of the pending claims in the MDL and claims pending in jurisdictions around the country.

69.     Moreover, Liberty knew or should have known that Aerofil faced significant exposure with respect to the subsequent Arbitration proceedings filed by Roanoke arising from the SNS Litigation.

70.     Despite specific and direct knowledge that dozens of claims and lawsuits were made or filed against Aerofil during Liberty's policy periods, and knowledge that Aerofil faced extensive exposure for the SNS Litigation, Liberty failed or refused to provide a defense to Aerofil, failed or refused to fund or participate in the underlying settlements, and effectively abandoned Aerofil on the hope that Aerofil's other insurers, including AISLIC, would otherwise assume the defense and indemnity responsibilities Liberty owed to Aerofil for the SNS Litigation.

71.     Then, following the resolution of the SNS Litigation, knowing that Aerofil still faced significant exposure for the subsequent Arbitration proceedings, Liberty simply chose to close its claim file.

72.     The SNS Litigation and the Arbitration proceedings have resulted in defense expenses, settlement payments, and a substantial Arbitration Award against Aerofil totaling more

than $50 million.

73.     Even after reopening its claim file, knowing the pending $30 million Arbitration Award threatened the financial viability and existence of Aerofil, Liberty still refused to provide coverage to Aerofil under either of its primary Policies without any justified reason or basis.

74.     To date, and despite requests from Aerofil's counsel, Liberty has not paid or even offered to contribute to the defense or settlement of any claims or lawsuits against Aerofil relating to the SNS Litigation or the Arbitration proceedings.

75.     As a direct and proximate result of Liberty's failure to defend or indemnify Aerofil in the SNS Litigation or the Arbitration proceedings, AISLIC agreed to defend and indemnify Aerofil for claims and lawsuits that triggered the Liberty Primary Policies and for which Liberty had defense and indemnity obligations.

76.     As a further result of Liberty's breach of its insurance contracts with Aerofil, including its failure and/or refusal to defend and indemnify Aerofil for the SNS Litigation and the Arbitration proceedings, AISLIC has paid more than $22 million and incurred other damages as a result of having to defend and settle claims on behalf of Aerofil that were the responsibility of Liberty.

77.     In light of Liberty's breach of its insurance contracts with Aerofil, including its failure and/or refusal to defend and indemnify Aerofil for the SNS Litigation and the Arbitration proceeding, there was insufficient insurance proceeds available to Aerofil from other insurers to satisfy or resolve the $30 million Arbitration Award.

78.     Aerofil therefore faced significant exposure for the Arbitration Award.

79.     Because of Liberty's breach of its obligations, Aerofil had to obtain a substantial loan and extend its line of credit, secured primarily by its business assets, in order to fund several

million dollars towards the settlement of the Arbitration Award.

**COUNT I**
**DECLARATORY JUDGMENT AS TO LIBERTY'S DUTY TO DEFEND**
**(28 U.S.C. § 2201)**
**(Aerofil and AISLIC)**

80.     The preceding paragraphs of this Complaint are deemed repeated and re-alleged such that each and every allegation contained in those paragraphs is incorporated by reference for this paragraph of Count I.

81.     An actual controversy exists between Plaintiffs and Liberty with respect to the obligations of Liberty to provide Aerofil with a defense under the Liberty Primary Policies for the SNS Litigation.

82.     An actual controversy also exists between Plaintiffs and Liberty with respect to the obligations of Liberty to provide Aerofil with a defense under the Liberty Primary Policies for the Arbitration proceedings.

83.     Pursuant to the terms and conditions of the Liberty Primary Policies, Liberty's duty to defend was triggered when a claim for damages because of "bodily injury" was first made against Aerofil during the policy period of the relevant Liberty Primary Policy.

84.     Thus, Liberty's duty to defend was triggered at the time any claim was first made and/or lawsuit is filed against Aerofil.

85.     Beginning in late 2006 and continuing until early 2008, which is during Liberty's policy periods, numerous claims in the SNS Litigation were first made against Aerofil thereby triggering Liberty's duty to defend Aerofil.

86.     The claims and/or lawsuits that were first made or filed against Aerofil between late 2006 and early 2008 were also reported to Liberty.

87.     The claims and/or lawsuits in the SNS Litigation that were first made or filed

14

against Aerofil during Liberty's policy periods, were also the same claims and lawsuits at issue and the subject of the Arbitration proceedings.

88.     Liberty therefore had a continuing obligation to defend Aerofil in the Arbitration proceedings under the Liberty Primary Policies.

89.     Pursuant to the terms and conditions of the Liberty Primary Policies, Liberty was also obligated to provide Aerofil with primary coverage and therefore had the obligation to defend Aerofil for claims or lawsuits in the SNS Litigation and in the Arbitration proceedings.

90.     Under the terms and conditions of the AISLIC Excess Policy, AISLIC's obligation, if any, was to provide excess coverage to Aerofil for claims or lawsuits in the SNS Litigation and/or the Arbitration proceedings.

91.     Liberty, as the primary insurer, therefore had the obligation to defend Aerofil in the SNS Litigation and for the Arbitration proceedings before AISLIC's defense obligation, if any, was triggered.

WHEREFORE, Plaintiffs Aerofil and AISLIC request that this Court enter an Order granting the following relief:

i)   A Declaration and Order finding that the 2006 Liberty Policy was triggered and Liberty had a duty to defend Aerofil for claims and lawsuits in the SNS Litigation and/or for the Arbitration proceedings;

ii)  A Declaration and Order finding that the 2007 Liberty Policy was triggered and Liberty had an obligation to defend Aerofil for claims and lawsuits in the SNS Litigation and/or for the Arbitration proceedings;

iii) A Declaration and Order finding that the Liberty Primary Policies provided primary coverage to Aerofil and therefore Liberty had the primary, sole, and exclusive

obligation to defend Aerofil for claims or lawsuits in the SNS Litigation and/or for the Arbitration proceedings;

iv) A Declaration and Order awarding Plaintiffs their costs, fees, and interest as this Court deems appropriate; and

v)  Any other relief this Court deems just and appropriate.

**COUNT II**
**DECLARATORY JUDGMENT AS TO LIBERTY'S DUTY TO INDEMNIFY**
**(28 U.S.C. § 2201)**
**(Aerofil and AISLIC)**

92.     The preceding paragraphs of this Complaint are deemed repeated and re-alleged such that each and every allegation contained in those paragraphs is incorporated by reference for this paragraph of Count II.

93.     An actual controversy exists between Plaintiffs and Liberty with respect to the obligations of Liberty to indemnify Aerofil under the Liberty Primary Policies for the SNS Litigation.

94.     An actual controversy also exists between Plaintiffs and Liberty with respect to the obligations of Liberty to indemnify Aerofil under the Liberty Primary Policies for the Arbitration proceedings.

95.     Pursuant to the terms and conditions of the Liberty Primary Policies, Liberty had an obligation and duty to indemnify Aerofil for any claims or lawsuits seeking damages for "bodily injury" that were first made against Aerofil during the policy period of the relevant Liberty Primary Policy.

96.     Numerous claims and/or lawsuits were first made or filed against Aerofil between late 2006 and early 2008 in the SNS Litigation and were also reported to Liberty.

97.     Liberty also requested and received various updates and relevant information

regarding the claims and lawsuits in the SNS Litigation.

98.     The claims and/or lawsuits in the SNS Litigation that were first made or filed against Aerofil during Liberty's policy periods, were settled in the SNS Litigation thereby triggering Liberty's duty to indemnify Aerofil.

99.     The claims and/or lawsuits in the SNS Litigation that were first made or filed against Aerofil during Liberty's policy periods were also the same claims and lawsuits at issue and the subject of the Arbitration proceedings.

100.    Liberty therefore has an obligation and duty to indemnify Aerofil for the Arbitration proceedings under the Liberty Primary Policies.

101.    Pursuant to the terms and conditions of the Liberty Primary Policies, Liberty was also obligated to provide Aerofil with primary coverage and therefore had the obligation to indemnify Aerofil for claims or lawsuits in the SNS Litigation and in the Arbitration proceedings.

102.    Under the terms and conditions of the AISLIC Excess Policy, AISLIC's obligation, if any, was to provide excess coverage to Aerofil for claims or lawsuits in the SNS Litigation and/or the Arbitration proceedings.

103.    Liberty, as the primary insurer, therefore had the primary obligation to indemnify Aerofil in the SNS Litigation and for the Arbitration proceedings before AISLIC's indemnification obligation, if any, was triggered.

104.    Alternatively, Liberty had, at the very minimum, an obligation to fund and contribute a proportionate share in the settlement of claims or lawsuits in the SNS Litigation and/or an obligation to fund and contribute a proportionate share in the settlement of the Arbitration proceedings.

WHEREFORE, Plaintiffs Aerofil and AISLIC request that this Court enter an Order granting the following relief:

i)   A Declaration and Order finding that the 2006 Liberty Policy was triggered and Liberty had a duty to indemnify Aerofil for claims and lawsuits in the SNS Litigation and/or for the Arbitration proceedings;

ii)  A Declaration and Order finding that the 2007 Liberty Policy was triggered and Liberty had a duty to indemnify Aerofil for claims and lawsuits in the SNS Litigation and/or for the Arbitration proceedings;

iii)  A Declaration and Order finding that the Liberty Primary Policies provided primary coverage to Aerofil and therefore Liberty had the primary obligation to indemnify Aerofil for claims or lawsuits in the SNS Litigation and/or for the Arbitration proceedings;

iv)  A Declaration and Order finding that the AISLIC Excess Policy provided excess coverage to Aerofil for claims or lawsuits in the SNS Litigation and/or for the Arbitration proceedings;

v)   In the alternative, a Declaration and Order finding that Liberty had an obligation to fund and contribute a proportionate share in the settlement of claims or lawsuits in the SNS Litigation and/or an obligation to fund and contribute a proportionate share in the settlement of the Arbitration proceedings;

vi)  A Declaration and Order awarding Plaintiffs their costs, fees, and interest as this Court deems appropriate; and

vii) Any other relief this Court deems just and appropriate.

## COUNT III
### BREACH OF CONTRACT AS TO LIBERTY'S DUTY TO DEFEND
#### (Aerofil)

105.    The preceding paragraphs of this Complaint are deemed repeated and re-alleged such that each and every allegation contained in those paragraphs is incorporated by reference for this paragraph of Count III.

106.    Aerofil paid substantial premiums and provided due consideration to Liberty when it purchased the Liberty Primary Policies.

107.    At all relevant times, Aerofil satisfied its obligations and complied with the terms, conditions, and requirements of the Liberty Primary Policies.

108.    Pursuant to the terms and conditions of the Liberty Primary Policies, Liberty's duty to defend was triggered when a claim for damages because of "bodily injury" was first made against Aerofil during the policy period of the relevant Liberty Policy.

109.    Thus, Liberty's duty to defend was triggered at the time any claim was first made and/or lawsuit is filed against Aerofil.

110.    Beginning in late 2006 and continuing until early 2008, which is during Liberty's policy periods, numerous claims in the SNS Litigation were first made against Aerofil thereby triggering Liberty's duty to defend Aerofil.

111.    At all relevant times, Aerofil sought insurance coverage from Liberty and tendered claims and lawsuits to Liberty relating to the SNS Litigation.

112.    The claims and/or lawsuits in the SNS Litigation that were first made or filed against Aerofil during Liberty's policy periods, were also the same claims and lawsuits at issue and the subject of the Arbitration proceedings.

113.    Liberty therefore had a continuing obligation to defend Aerofil in the Arbitration

proceedings under the Liberty Primary Policies.

114.    Liberty wrongfully disclaimed or otherwise failed and/or refused to honor its obligation under the Liberty Primary Policies to defend Aerofil for claims and lawsuits in the SNS Litigation and the Arbitration proceedings.

115.    Despite specific and direct knowledge that claims and lawsuits were made or filed against Aerofil during Liberty's policy periods, and knowledge that Aerofil faced extensive exposure for the SNS Litigation and the Arbitration proceedings, Liberty failed or refused to defend Aerofil for the SNS Litigation, refused to fund or participate in the defense of the Arbitration proceedings, and effectively abandoned Aerofil on the hope that Aerofil's other insurers, including AISLIC, would otherwise assume Liberty's defense responsibilities for the SNS Litigation and Arbitration proceedings.

116.    Liberty's conduct and actions of failing and/or refusing to honor its obligation to defend Aerofil under the Liberty Primary Policies is a material breach of the terms and conditions of the Liberty Primary Policies.

117.    As a consequence of Liberty's breach of its duty to defend, it is also estopped from challenging any of Aerofil's litigation decisions, the management of its defense, and other aspects of its settlements in the SNS Litigation and the Arbitration proceedings.

118.    As a proximate result of Liberty's material breach, Aerofil has suffered considerable damages in that it was left without the benefit of a defense provided under the Liberty Primary Policies for the claims and lawsuits in the SNS Litigation and the Arbitration proceedings and had to seek that defense from its other insurers, including AISLIC.

WHEREFORE, Plaintiff Aerofil requests that this Court enter an Order granting the following relief:

i)   An Order awarding Aerofil compensatory and consequential damages for Liberty's material breach of its obligation under the 2006 Liberty Policy to defend Aerofil for claims and lawsuits in the SNS Litigation and the Arbitration proceedings;

ii)   An Order awarding Aerofil compensatory and consequential damages for Liberty's material breach of its obligation under the 2007 Liberty Policy to defend Aerofil for claims and lawsuits in the SNS Litigation and the Arbitration proceedings;

iii)  An Order finding that Liberty is estopped from challenging any of Aerofil's litigation decisions, the management of the defense, and other aspects of its settlements in the SNS Litigation and the Arbitration proceedings;

iv)  An Order awarding fees, costs, and interest as this Court deems appropriate; and

v)   Any other relief this Court deems just and appropriate.

<u>**COUNT IV**</u>
**BREACH OF CONTRACT AS TO LIBERTY'S DUTY TO INDEMNIFY**
**(Aerofil)**

119.    The preceding paragraphs of this Complaint are deemed repeated and re-alleged such that each and every allegation contained in those paragraphs is incorporated by reference for this paragraph of Count IV.

120.    Aerofil paid substantial premiums and provided due consideration to Liberty when it purchased the Liberty Primary Policies.

121.    At all relevant times, Aerofil satisfied its obligations and complied with the terms, conditions, and requirements of the Liberty Primary Policies.

122.    Pursuant to the terms and conditions of the Liberty Primary Policies, Liberty had an obligation and duty to indemnify Aerofil for any claims or lawsuits seeking damages for "bodily injury" that were first made against Aerofil during the policy period of the relevant

Liberty Policy.

123.   Numerous claims and/or lawsuits were first made or filed against Aerofil between late 2006 and early 2008 in the SNS Litigation and were also reported to Liberty.

124.   At all relevant times, Liberty and/or its coverage counsel requested and received updates and relevant information regarding the claims and lawsuits in the SNS Litigation from Aerofil and/or the TPA.

125.   At various times throughout the underlying SNS Litigation, Liberty and/or its coverage counsel also requested and received policy documentation and loss run information from other insurers, including AISLIC.

126.   The claims and/or lawsuits in the SNS Litigation that were first made or filed against Aerofil during Liberty's policy periods, were settled in the SNS Litigation thereby triggering Liberty's duty to indemnify Aerofil.

127.   The claims and/or lawsuits in the SNS Litigation that were first made or filed against Aerofil during Liberty's policy periods were also the same claims and lawsuits at issue and the subject of the subsequent Arbitration proceedings.

128.   Liberty therefore has an obligation and duty to indemnify Aerofil in the Arbitration proceedings under the Liberty Primary Policies.

129.   Despite specific and direct knowledge that Aerofil faced extensive exposure for the SNS Litigation and the Arbitration proceedings, Liberty refused to indemnify Aerofil, refused to fund or participate in the underlying settlements or the Arbitration proceedings, and effectively abandoned Aerofil on the hope that Aerofil's other insurers, including AISLIC, would otherwise assume Liberty's indemnity responsibilities to Aerofil for the SNS Litigation and Arbitration proceedings.

130.    Liberty's conduct and actions of failing and refusing to honor its obligation to indemnify Aerofil under the Liberty Primary Policies is a material breach of the terms and conditions of the Liberty Primary Policies.

131.    As a proximate result of Liberty's material breach, Aerofil was left with significant exposure for the SNS Litigation and the Arbitration proceedings because there was insufficient available insurance proceeds from other insurers to satisfy or attempt to satisfy the $30 million Arbitration Award.

132.    Also because of Liberty's material breach, Aerofil's business operations and reputation have suffered, and it also had to retain separate counsel in order to investigate and assess a potential bankruptcy filing in the event the $30 million Award could not be satisfied through its own assets and/or the limited available insurance proceeds from other insurers.

133.    In an effort to save its company, Aerofil also obtained a substantial loan and line of credit for several millions of dollars, secured by its own business assets, in order to contribute towards the settlement and resolution of the Arbitration Award.

134.    As a further proximate result of Liberty's material breach, AISLIC has paid millions of dollars in settlements and incurred other damages as a result of having to defend and settle claims related to the SNS Litigation and the Arbitration proceedings on behalf of Aerofil that were the primary responsibility of Liberty.

WHEREFORE, Plaintiff Aerofil requests that this Court enter an Order granting the following relief:

i)    An Order awarding Aerofil compensatory and consequential damages for Liberty's material breach of its obligation under the 2006 Liberty Policy to indemnify Aerofil for claims and lawsuits in the SNS Litigation and the Arbitration proceedings;

ii)  An Order awarding Aerofil compensatory and consequential damages for Liberty's material breach of its obligation under the 2007 Liberty Policy to indemnify Aerofil for claims and lawsuits in the SNS Litigation and the Arbitration proceedings;

iii)  An Order awarding fees, costs, and interest as this Court deems appropriate; and

iv)  Any other relief this Court deems just and appropriate.

## COUNT V
## CONTRACTUAL SUBROGATION
### (AISLIC as subrogee)

135.    The preceding paragraphs of this Complaint are deemed repeated and re-alleged such that each and every allegation contained in those paragraphs is incorporated by reference for this paragraph of Count V.

136.    Pursuant to the terms of the Liberty Primary Policies, Liberty owed a duty to defend and indemnify Aerofil with regard to the SNS Litigation and the Arbitration proceedings.

137.    Liberty either wrongfully disclaimed or otherwise failed to honor its duties to defend and indemnify Aerofil with regard to claims or lawsuits in the SNS Litigation.

138.    Liberty also either wrongfully disclaimed or otherwise failed to honor its duty to defend and indemnify Aerofil with regard to the Arbitration proceedings.

139.    As a result of Liberty's failure to honor its duty to defend and indemnify Aerofil under the Liberty Primary Policies, AISLIC agreed to fund some or all of Aerofil's defense and indemnity in the SNS Litigation and the Arbitration proceedings that was owed, and should have been funded, by Liberty.

140.    The AISLIC Excess Policy contains a "Transfer of Rights of Recovery" provision that gives AISLIC a contractual right of subrogation to recover all or part of any payment made under the AISLIC Excess Policy that should have been made by another party.

141.    AISLIC has paid in excess of $22 million in defense and indemnity payments on behalf of Aerofil for claims and losses relating to the SNS Litigation and the Arbitration.

142.    As a result of AISLIC's payments on behalf of Aerofil for defense and indemnity for the SNS Litigation and the Arbitration proceedings, AISLIC has a contractual right of subrogation to recover all or some of these payments from Liberty.

WHEREFORE, Plaintiff AISLIC, as subrogee, requests that this Court enter an Order granting the following relief:

i)    An Order awarding AISLIC recovery of the defense and indemnity payments it made for which Liberty is determined to have owed to Aerofil under the Liberty Primary Policies relating to claims and lawsuits in the SNS Litigation;

ii)    An Order awarding AISLIC recovery of the defense and indemnity payments it made for which Liberty is determined to have owed to Aerofil under the Liberty Primary Policies relating to the Arbitration proceedings; and

iii)    An Order awarding costs, fees, and interest as this Court deems appropriate; and

iv)    Any other relief this Court deems just and appropriate.

## COUNT VI
## EQUITABLE CONTRIBUTION
### (AISLIC)

143.    The preceding paragraphs of this Complaint are deemed repeated and re-alleged such that each and every allegation contained in those paragraphs is incorporated by reference for this paragraph of Count VI.

144.    Liberty owed a duty to defend and indemnify Aerofil for some or all of the claims and lawsuits in the SNS Litigation.

145.    Liberty also owed a duty to defend and indemnify Aerofil for the Arbitration

proceedings.

146.    Liberty either disclaimed or otherwise failed to honor its duties to defend and indemnify Aerofil and has otherwise not paid or contributed to the settlement or defense of claims or lawsuits in the SNS Litigation or the Arbitration proceedings.

147.    To date, AISLIC has funded and paid more than $22 million in defense and indemnity on behalf of Aerofil for claims or lawsuits in the SNS Litigation and the Arbitration proceedings.

148.    Liberty was, at a minimum, responsible for a proportionate share as to some or all of the $22 million funded and paid by AISLIC to defend and indemnify Aerofil in the SNS Litigation and the Arbitration proceedings.

149.    Pursuant to Liberty's failure to satisfy its obligations to Aerofil under the Liberty Primary Policies, AISLIC paid a disproportionate share of the defense and indemnity on behalf of Aerofil in the SNS Litigation and the Arbitration proceedings.

150.    Accordingly, AISLIC has an equitable right of contribution against Liberty to recover some or all of the $22 million it funded and paid on behalf of Aerofil related to the defense and indemnity for claims and lawsuits in the SNS Litigation and the Arbitration proceedings.

WHEREFORE, Plaintiff AISLIC requests that this Court enter an Order granting the following relief:

i)    An Order awarding AISLIC recovery for the proportionate share of the $22 million in defense and indemnity payments it funded and paid on behalf of Aerofil for which Liberty was legally obligated to fund and pay under the Liberty Primary Policies relating to claims and lawsuits in the SNS Litigation and the Arbitration proceedings;

ii) An Order awarding AISLIC recovery for any overpayments it made on behalf of Aerofil relating to the SNS Litigation and the Arbitration proceedings for which this Court determines should have been rightfully paid by Liberty;

iii) An Order awarding costs, fees, and interest as this Court deems appropriate; and

iv) Any other relief this Court deems just and appropriate.

**COUNT VII**
**UNJUST ENRICHMENT**
**(AISLIC)**

151.   The preceding paragraphs of this Complaint are deemed repeated and re-alleged such that each and every allegation contained in those paragraphs is incorporated by reference for this paragraph of Count VII.

152.   Liberty owed a duty to defend and indemnify Aerofil under the Liberty Primary Policies with respect to claims and lawsuits in the SNS Litigation and the Arbitration proceedings.

153.   Liberty wrongfully denied or refused to honor its defense and indemnity obligation to Aerofil, and refused to fund or contribute any payments, with respect to the SNS Litigation and the Arbitration proceedings.

154.   As a result, AISLIC incurred and funded additional defense and indemnity payments for the SNS Litigation and the Arbitration proceedings that should have been satisfied or borne by Liberty.

155.   Liberty therefore benefitted and was enriched by its own breach and failure to honor its obligation to Aerofil under the Liberty Primary Policies at AISLIC's expense.

156.   Accordingly, it would be unjust to allow Liberty to retain the benefit of payments made by AISLIC that were the result of Liberty's own breach and failure to honor its obligations

under the Liberty Primary Policies to Aerofil.

WHEREFORE, Plaintiff AISLIC requests that this Court enter an Order granting the following relief:

i)   An Order awarding AISLIC restitution and recovery for defense and indemnity payments it funded and paid on behalf of Aerofil for which Liberty was legally obligated to fund and pay under the Liberty Primary Policies relating to claims and lawsuits in the SNS Litigation and the Arbitration proceedings;

ii)   An Order awarding AISLIC restitution and recovery for any overpayments it made on behalf of Aerofil relating to the SNS Litigation and Arbitration proceedings for which this Court determines should have been rightfully paid by Liberty;

iii)   An Order awarding costs, fees and interest as this Court deems appropriate; and

iv)   Any other relief this Court deems just and appropriate.

[*This space intentionally left blank.*]

Dated:  October 16, 2015

AEROFIL TECHNOLOGY, INC. and
AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY

By: */s/ Kelley F. Farrell*
One of the attorneys for Plaintiffs,
AEROFIL TECHNOLOGY, INC. and
AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY

Kelley F. Farrell (#43027 Mo.)
BLITZ, BARDGETT & DEUTSCH, LC
120 South Central, Suite 1500
St. Louis, Missouri 63105-1742
(314) 863-1500 (phone)
(314) 863-1877 (fax)
kfarrell@bbdlc.com

Joseph A. Hinkhouse (application for *pro hac vice*
admission forthcoming)
David M. Dolendi (application for *pro hac vice*
admission forthcoming)
Joshua A. Boggioni (application for *pro hac vice*
admission forthcoming)
HINKHOUSE WILLIAMS WALSH LLP
180 North Stetson, Suite 3400
Chicago, Illinois 60601-6740
(312) 784-5400 (phone)
(312) 784-5499 (fax)
jhinkhouse@hww-law.com
ddolendi@hww-law.com
jboggioni@hww-law.com